**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| Rhoderick Beery, III | ) | |
| | ) | |
|       Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| Robert Chandler, Esq. | ) | |
| | ) | Jury Trial Demanded |
|       Defendant, | ) | |
| | ) | |
| Jeffrey Roper, Esq. | ) | |
| | ) | |
|       Defendant, | ) | |
| | ) | |
| Baker, Sterchi, Cowden & Rice, LLC | ) | |
| | ) | |
|       Defendant. | ) | |

## <u>COMPLAINT</u>

COMES NOW Plaintiff, by and through counsel and brings the following cause of action against the Defendants.  In support, thereof, Plaintiff states:

**PROCEDURAL SUBSTANTIATION**

1)     That Plaintiff is a citizen of Nebraska.

2)     That Defendant Robert Chandler ("Chandler") is a citizen of the State of Missouri.

3)     That Defendant Jeffrey Roper ("Roper") is a citizen of the State of Missouri.

4)     That Defendant Baker, Sterchi, Cowden & Rice, LLC ("Sterchi") is a limited liability created in the State of Missouri.

5)      That Plaintiff and Defendants collectively are citizens of different states; thereby diversity of citizen is present allowing this court to have jurisdiction of this matter pursuant to 28 USCA § 1332.

6)      That Plaintiff's claim for damages is in excess of $75,000 as required by 28 USCA § 1332.

7)      That the actions complained of in this matter occurred in the Missouri counties of St. Charles and St. Louis and the City of St. Louis; thus, venue is proper in this Court pursuant to 28 USCA § 1391(b)(2).

## COUNT I – MISREPRESENTATION/LEGAL MALPRACTICE

**UNDERLYING CASE**

8)      That Plaintiff and Plaintiff's father[1] entered into a contract with National Auto Warranty Services, Inc. ("NAW").  The original contract stipulated that upon Plaintiffs obtaining an insurance license for NAW; Plaintiffs would be paid $24 per contract ($12 to Plaintiff and $12 to Plaintiff's father) from NAW.  NAW was awarded an insurance license and was writing approximately 12,000-15,000 policies per month.  NAW ceased paying Plaintiff in accordance with the contract.

**MISREPRESENTATION/LEGAL MALPRACTICE**

9)      That Defendant Roper (representing himself as a Missouri licensed attorney) solicited Plaintiffs to represent them in a breach of contract action against NAW.

---

[1] Plaintiff's father Rhoderick Beery, II assigned his interest in this matter to Plaintiff.  For purposes of this Complaint, we will refer to them jointly as "Plaintiffs."

10)     That on or about the 20th day of  March 2008 Plaintiffs entered into a contingency fee agreement with Roper for the purpose of Roper representing Plaintiffs in the cause of action against NAW.

11)     That unbeknownst to Plaintiffs, Roper was not a not then or now or ever was a licensed attorney in the State of Missouri. *Roper Depo – Page 34, Lines 18-22*.  In order to further Roper's scheme, Roper used legal letterhead purporting to reflect a law office in Clayton, Missouri.  *Roper Depo – Page 43, Lines 16-23*. At the time of executing the contract with the Plaintiffs, Defendant Roper was not a licensed attorney in any state in the union.  *Roper Depo – Page 57, Lines 15-21*.

12)     That in order for Roper to further his fraud, Roper retained the services of Defendant Robert Chandler, Esq. for the purpose of filing pleadings in the St. Charles County Circuit Court for the breach of contract action against NAW. That Roper concealed the hiring of Defendant Chandler from Plantiffs to further his scheme.

13)     That Defendant Chandler undertook the matter of the Plaintiffs versus NAW without ever meeting, discussing, or obtaining any kind of permission from Plaintiffs whatsoever.

14)     That Defendant Chandler was at the time of the representation and continues to be an attorney with the firm of Defendant Sterchi.

15)     That Defendant Sterchi failed to properly supervise, monitor, and perform and or have in place applicable audit procedures to prevent their firm from undertaking the interest of client(s) without any privy, communication or agreement with client(s).

16)     That at the time Defendant Roper entered into the contract with the Plaintiffs, Defendant Roper lacked the experience and expertise to handle a case with potential damages in excess of $10,000,000. As proof thereof, Plaintiffs state:

a)     That at the time Defendant Roper entered into the contract with the Plaintiffs, Defendant Roper had never practiced law. *Roper Depo – Page 16, Lines 8-13.*

b)     That at the time Defendant Roper entered into the contract with the Plaintiffs, Defendant Roper never handled a single case. *Roper Depo – Page 16, Lines 14-20.*

c)     That Roper never disclosed his lack of experience to Plaintiffs. *Roper Depo – Page 17, Lines 1-3.*

d)     That in the summer of 2009 Defendant Roper advised Plaintiffs not to accept a settlement offer of $3,000,000 from NAW.  Defendant Roper made this legal advice to Plaintiffs knowing that he was not licensed to practice law in the States of Missouri and that he lacked any legal experience whatsoever to substantiate such advice. *Roper Depo – Page 63, Lines 17-21.*

e)     That Defendant Roper and Defendant Chandler' lack of urgency to obtain a monetary judgment against NAW, forced Plaintiffs to be categorized as an unsecured creditor in the bankruptcy of NAW and, as such, were paid out a lower percentage of damages.

f)     That Roper and Chandler continued to conceal the scheme of Roper's until sometime in 2010.

g)     That Roper and Chandler having concealed the unlawful acts of Roper denied Plaintiffs the opportunity to have adequate legal representation in their $10,000,000

lawsuit against NAW.  As such, Plaintiffs were without legal representation to diligently pursue their cause of action against NAW. Such action/inaction enabled NAW to structure its financial transactions to prevent Plaintiffs from ever obtaining monetary damages that fully compensate Plaintiffs for their damages.

        h)    That during the course of the litigation between Plaintiffs and NAW, the Plaintiffs were presented with several business opportunities unrelated to NAW.  Defendants Roper and Chandler advised Plaintiffs not to accept the business opportunities as acceptance of the business opportunities would lessen Plaintiffs' damages in the NAW lawsuit. Such legal advice caused the Plaintiffs to forego business opportunities in excess of $1,000,000.  The legal advice to forego this opportunity was erroneous advice and created financial hardships for the Plaintiffs and said advice was not supported by the law of the State of Missouri.

17)    That upon learning of the misrepresentation of Roper, Plaintiffs were required to obtain new counsel and agree to a financial settlement that paid Plaintiffs pennies on the dollar.

18)    That Defendant Roper having devised a scheme to defraud Plaintiffs; Defendant Roper had the audacity to file an attorney's lien in an attempt to be awarded a portion of Plaintiffs compensatory settlement award. The lien was dismissed by the Circuit Court of St. Charles after Plaintiffs expended over $15,000 to retain additional counsel to contest the lien.

WHEREFORE, Plaintiff prays this Court will enter an judgment in favor of Plaintiff and against Defendants, joint and severally, in the amount of $10,000,000, award Plaintiff costs of this action, attorney's fees, and enter any other damages this Court deems necessary and proper.

RESPECTFULLY SUBMITTED,


  /s/  Christopher S. Swiecicki
Christopher S. Swiecicki – Missouri Bar No. 38402
Attorney At Law
15510 Crater Drive
Chesterfield, MO 63017
314.341.5796
Christopher.Swiecicki@gmail.com
Attorney for Plaintiff

IN THE CIRCUIT COURT OF ST. CHARLES COUNTY
STATE OF MISSOURI

| | | |
|---|---|---|
| RHODERICK BEERY, II, ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 0811-CV03612 Division 3 |
| NATIONAL AUTO WARRANTY SERVICES, INC., | ) ) ) | |
| Defendant. | ) | |

DEPOSITION OF JEFFREY L. ROPER
TAKEN ON BEHALF OF THE PLAINTIFFS
SEPTEMBER 4, 2013

Tracey Aurelio, RDR, CRR, CSR, CCR

CSR No. 084.003465

CCR No. 973

EXAMINATION BY MR. SEVASTIANOS

Page 34

1    Q.   Other than that entry, can you recall any

2    other time you might have billed the Beerys for time

3    that you were in court?

4        A.   No.

5        Q.   And there is also an entry dated 4/10/09.

6    Do you see that?

7        A.   I do.

8        Q.   And is that your time at a mediation of the

9    matter?

10       A.   It was.

11       Q.   And where was that mediation held?

12       A.   Downtown St. Louis.

13       Q.   And the court case, of course, would have

14   been the court case in St. Charles; is that right?

15       A.   Correct.

16       Q.   You're licensed in Illinois, correct?

17       A.   Correct.

18       Q.   And you don't hold a Missouri license; is

19   that right?

20       A.   Correct.

21       Q.   You have never held a Missouri license?

22       A.   Correct.

23       Q.   And pardon me if I'm repeating myself, but

24   did you ever tell the Beerys that you were not

EXAMINATION BY MR. SEVASTIANOS

Page 43

1       Q.    That you were not a practicing law firm?

2             MR. SEAMANDS:   I'm going to object to that.

3       That's not what he testified to.

4             MR. SEVASTIANOS:   I believe he said he did

5       not have a law firm.

6       Q.    (By Mr. Sevastianos) So did you tell the

7       Beerys that you did not have a law firm?

8       **A.    I do not recall specifically telling them**

9       **that, but again I did tell them that there would have**

10      **to be additional attorneys hired in this case.**

11      Q.    Well, occasionally you will refer to the

12      firm in the letter in 2008.  And I'm wondering the

13      letter marked as Exhibit Number 3, I'm wondering what

14      firm are you referring to?

15      **A.    I don't recall.**

16      Q.    So don't you think it's fair, Mr. Roper,

17      that this letter that you are holding, Exhibit

18      Number 3, represents to the Beerys that you are a

19      practicing Missouri lawyer, given the fact that there

20      is a Missouri telephone number and a Missouri address

21      and there's no indication at all that you're only

22      licensed in Illinois?

23      **A.    I don't know.**

24      Q.    Don't you think that's a fair assumption?

EXAMINATION BY MR. SEVASTIANOS

1   status of your Illinois law license?

2       A.   I made a photocopy of my IARDC --

3       Q.   The ARDC card from 2013?

4       A.   Correct, and went to the IARDC.org website

5   and printed out my registration and public

6   disciplinary record.

7       Q.   You believe that the document that you

8   produced shows your entire record regarding your

9   history with the ARDC?

10      A.   It looks to be more of a current status.

11      Q.   Have you undertaken any effort at all to

12  determine whether or not your license in Illinois was

13  current on or about March 20 of 2008?

14      A.   I have not.

15      Q.   And if there is information to suggest that

16  your Illinois law license was not in good standing on

17  March 20 of 2008, would it be fair to say, as a lawyer

18  who has reviewed case law and as a person who has a

19  degree from Washington University Law School, that

20  your contract with the Ropers is not enforceable?

21      A.   I don't know.

22      Q.   Do you know whether or not your law license

23  was in effect or effective, your Illinois law license,

24  at the time you filed your notice of lien?

EXAMINATION BY MR. SEVASTIANOS

Page 16

1  interest in The Mutual Fund Store in California?

2      **A.    Opened in 2008 but began the process in**

3  **2007.**

4      Q.    And had you actually opened the California

5  store in March of 2008?

6      **A.    We were committed to opening it.  I believe**

7  **we opened June 1 in 2008.**

8      Q.    Okay.  Obviously what I didn't hear was that

9  you've been engaged in the practice of law at any time

10 between the time you graduated at Washington

11 University until the time you entered into the

12 agreement.  Is that a fair statement?

13     **A.    It is.**

14     Q.    Had you ever handled a single case as a

15 lawyer where you were responsible for that case from

16 start to finish, or really any part of the case,

17 between the time you graduated law school and the time

18 you entered into the agreement marked as Exhibit

19 Number 3?

20     **A.    I had not.**

21     Q.    Okay.  Did you disclose that fact to the

22 Ropers -- I'm sorry -- to the Beerys?  You wouldn't

23 have to disclose it to yourself.

24     **A.    They were aware that I would not be**

EXAMINATION BY MR. SEVASTIANOS

Page 17

1    litigating the case.  But as far as disclosing that,

2    no, but disclosing that I would not be litigating it,

3    yes.

4         Q.   So tell me what you told either of the

5    Beerys before you entered into the engagement contract

6    with them in March of 2008 regarding your need to

7    associate with other lawyers in handling their case.

8         A.   That it would be mandatory that I would not

9    be litigating this case.

10        Q.   Okay.  And did you tell them why?

11        A.   We discussed time constraints and that I

12   hadn't litigated cases.  I didn't have the time to do

13   it and needed someone to bring in an expert to handle

14   that aspect of the case.

15        Q.   So I believe you told me that one of the

16   Beerys called you originally to talk about possible

17   representation; is that right?

18        A.   Correct.

19        Q.   And you went ahead and presented the

20   contract we marked as Exhibit Number 3 to R.J.,

21   correct?

22        A.   Eventually.

23        Q.   And is it your testimony that you had told

24   R.J. before signing the contract marked as Exhibit

EXAMINATION BY MR. SEVASTIANOS

1    Q.   Did you ever advise either of the Beerys

2  regarding whether or not to accept the settlement that

3  was being offered either in 2009 or 2010 or at any

4  other time?

5    A.   To accept?  Did I advise them to accept it?

6    Q.   Yes, sir.

7    A.   Our conversations in 2009 were to not accept

8  the current settlement offer.  And the conversations

9  in 2010 was my relaying the conversations with

10 Mr. Goldberg to the Beerys.

11   Q.   Okay.  I'm not sure if you answered exactly

12 the question, so I will just, at the risk of being

13 redundant, ask you a different way.

14        At any time did you ever advise either of

15 the Beerys on whether or not to accept a settlement

16 offer?

17   A.   I never advised the Beerys to accept a

18 settlement offer.

19   Q.   Did you ever advise the Beerys not to accept

20 a settlement offer?

21   A.   In the summer of 2009.

22   Q.   Did you maintain any records for the

23 expenses that you paid on this case?  Did you write a

24 check for a deposition?  Was that money out of your